# Case No. 15-1293

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

### IN RE THE WASHINGTON POST

*Petitioner.*

Petition for Writ of Mandamus
to the United States District Court for the Eastern District of Virginia
in *U.S. v. McDonnell, et al.*, No. 3:14-CR-12

# REPLY MEMORANDUM ON BEHALF OF THE WASHINGTON POST

Craig T. Merritt (VSB No. 20281)
David B. Lacy (VSB No. 71177)
CHRISTIAN & BARTON, L.L.P.
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
Tel.: (804) 697-4100
Fax: (804) 697-4112
cmerritt@cblaw.com
dlacy@cblaw.com

*Counsel for Petitioner*
*WP Company LLC, d/b/a The Washington Post*

Petitioner, WP Company LLC, d/b/a *The Washington Post* (the "*Post*"), by counsel, submits this reply memorandum in support of its petition for writ of mandamus. The petition is not opposed by the McDonnells. The United States (the "Government") opposes the petition. The Government's brief in opposition: (1) suggests the district court conducted proceedings that, in fact, never occurred; (2) minimizes the critical role that the responses to the *voir dire* questionnaire played in selecting an impartial jury; (3) offers after-the-fact rationalizations for the district court's actions that cannot be found in the record; and (4) presents new, legally insufficient "harms" to privacy that were never articulated in findings by the district court.

The Government emphasizes the high standard for the issuance of a writ of mandamus. (*See* Response of the United States in Opposition to Petition for Writ of Mandamus ("Gov't. Resp.") at 1, 16, 25.) First, the legal error in this case is clear, as the right to public release of identifying information about prospective and seated jurors is "clear and indisputable" under controlling Supreme Court precedent. The inability to link questionnaire responses to the individuals who submitted them simply robs the responses of their explanatory power; the Government focuses entirely on the quantity of the material released while ignoring its quality. Second, as the *Post* noted in its petition, mandamus is the preferred procedural vehicle for press intervenors, as the substantive law

2

recognizes both the importance of timely resolution of the constitutional claims being asserted and the inherent deficiencies of appeal for that purpose. Third, an appellate court reviewing a claim that a First Amendment access right has been impaired does not defer to the district court, but engages in *de novo* review.

**I.   The Government Confuses the Procedures Employed Below.**

The Government does not present a clear chronology of the relevant proceedings. Instead, it refers to events in a manner that suggests the district court conducted hearings or made findings that never occurred. It obscures the four relevant turning points:

(1)   After the questionnaires were issued, the written responses were returned to the district court, and the in-court portion of *voir dire* was completed on July 28, 2014. The *Post*'s reporter requested access to the completed responses. That July 31, 2014 request was denied; the district court issued an order (the "First Sealing Order") *sua sponte* that very afternoon sealing the responses. (*See* Petition for Writ of Mandamus ("Pet."), Ex. 6.) Prior to the entry of the First Sealing Order, there was no notice or hearing relating to the sealing of the questionnaire or the responses. This contravened *Press-Enterprise Co. v. Superior Court of California ("Press-Enterprise I")*, 464 U.S. 501 (1984).

(2)   After the *Post* moved to have the questionnaire and the responses unsealed, the district court conducted a hearing on August 15, 2014. At that

hearing, the focus of defense counsel, the prosecutors and the court was the prejudice to a fair trial that might occur if the questionnaire responses were made public during trial. The district court entered an order on September 2, 2014 (the "Second Sealing Order") delaying the release of the questionnaire responses until after the conclusion of the trial. (*See* Pet., Ex. 8.) The *Post* did not object to that outcome, as the Second Sealing Order granted the basic relief requested – release of the responses. Nothing on the face of the Second Sealing Order suggested that redactions would be more extensive than required to remove deeply personal information.

(3)     On December 30, 2014, the *Post* moved the district court to release the responses, at least on a rolling basis. (*See* Pet., Ex. 9.) Neither the Government nor the defendants responded.

(4)     On January 20, 2015, the district court released the questionnaire responses. Names and juror numbers were removed. Various redactions were made, but the court did not disclose on the record whether any individual answers were redacted based on application of the *Press-Enterprise I* test. The redactions, according to the Government, removed "a small amount of additional information to prevent prospective jurors from being identified through the answers that they gave." (Gov't Resp. at 14.) The *Post* moved the district court, on March 2, 2015, to once again associate names and juror numbers with the individual responses.

4

(*See* Pet., Ex. 14.)  Again, neither the Government nor the defendants responded. The district court denied the motion on March 9, 2015. (*See* Pet., Ex. 15.)

Now, the Government, with reference not only to fair trial rights but to privacy harms, suggests that the district court "considered and weighed these factors." (Gov't Resp. at 18.)  The only hearing at which the parties considered factors relevant to the sealing of the responses took place during trial, after the district court had already sealed them without notice or hearing.  At that time, the driving consideration was a fair trial for the McDonnells.  That explains the resulting Second Sealing Order's focus on delaying the release of the responses until after trial.  As the Government concedes, "the district court focused in its finding on prejudice that disclosure during trial would cause." (Gov't Resp. at 18.) The Government quotes the Second Sealing Order, and despite its highlighting of the district court's conclusory, forward-looking statement about personal information, it is clear that the only "findings" in the passage relate to fair trial concerns. (*See* Pet., Ex. 8.)  After the trial concluded, when fair trial considerations had faded into insignificance, neither the Government nor the district court articulated how the rule of *Press-Enterprise I* was applied to result in the odd redactions that emerged from the process.

The Government also condenses the procedural timeline to conflate two distinct processes.  It begins its discussion of the judicial district's Plan for the

5

Random Selection of Grand and Petit Jurors by describing questions included in "the questionnaire" used to carry out that Plan. It then cites the statutory rule of nondisclosure for certain information collected under that Plan. (*See* Gov't Resp. at 10-11.) This is followed by a "jump" at the bottom of page 11 from a generalized discussion of the Plan to a statement that *voir dire* in the case was conducted in court on July 28, 2014. (*See id.* at 11.) Reading the passage, one might easily forget that the questionnaire and responses used for juror *voir dire* were not the questionnaires issued under the Plan. The *voir dire* questions were the result of substantial pretrial work by the parties and the court that began six months prior to trial – a process distinct from the administration of the Plan.[1]

## II.     The Use of Written Questionnaires Cannot Undermine *Press Enterprise I*.

*Press Enterprise I* announced unequivocally that the process of *voir dire*, during which the capabilities of individual citizens to serve in a fair and impartial manner are explored, is presumptively open to the public. Persons with names and faces are asked pointed questions that the trial court has permitted because those questions are relevant to their ability to hear evidence and follow instructions in an

---

[1]     The fact that some of the later-used questions in the *voir dire* questionnaire "overlap" the questions used under the Plan is noted in the Government's brief (*see* Gov't Resp. at 23), but there is no explanation why that "overlap" compels the conclusion that *Press-Enterprise I* may therefore be abandoned as the controlling rule of access to *voir dire*.

unbiased manner. Nothing in *Press-Enterprise I* intimates that *voir dire* is divisible into two categories: (1) questioning in open court, during which identifiable persons give answers to questions, subject to a narrow rule that prevents disclosure of deeply personal matters, and (2) submission of written questions and receipt of written answers, in a process that allows the answers to be withheld, the identities of the prospective jurors to be hidden, or some combination of the two.

Were this the rule, written *voir dire* would be a readily-available tool for every trial judge who harbors an antipathy toward the command of *Press Enterprise I*. For this reason, appellate courts have placed written *voir dire* on an equal footing with *voir dire* conducted in open court. *See In re South Carolina Press Ass'n*, 946 F.2d 1037, 1040-41 & n.3 (4th Cir. 1991); *In re Access to Jury Questionnaires*, 37 A.3d 879, 886 (D.C. 2012) (collecting cases).

The Government is not so bold as to argue directly for a two-tiered rule. Instead, it peppers its brief with characterizations intimating that written responses to juror questionnaires have a secondary status under the First Amendment. On one occasion, it refers to "background questionnaire[s]." (Gov't Resp. at 20.) On another, it states flatly that "*voir dire* was conducted in a hearing that lasted over five hours." (*Id*. at 11.) Again it states, "this Court conducted a full day of *voir dire* in open court, protecting the public's right to follow jury selection." (*Id*. at

7

21.) The premise the Government is trying to seduce this Court to accept is that written *voir dire* is secondary – that "real" *voir dire* is only what happens in court, and access to that alone is sufficient under the Constitution.

This fiction cannot be maintained, because the government must debunk it for other purposes. First, in its effort to characterize the answers of the prospective jurors as "sensitive, personal information," it catalogs a number of the questions that the prospective jurors answered. (Gov't Resp. at 6-10.) The "personal" questions about employment and family, while rather searching, were approved by the district court as necessary to the selection of a fair jury. They would routinely have been answered in public had the questioning been conducted in open court, subject to any "bench conference" necessary to protect individuals who were invited to disclose truly sensitive information. The "personal" questions about media preferences, political activity and voting were highly relevant to this prosecution of a former governor. The transcript of the in-court conclusion of *voir dire* demonstrates that the answers to these very questions were used to strike prospective jurors. (*See, e.g.,* Pet., Ex. 4 at 149:16-153:12.) If the questions were important enough to ask, they were important enough to answer openly, with the identities of prospective jurors disclosed.

The Government understands perfectly the significance of the responses to the questionnaire. When opposing Mr. McDonnell's claim on appeal that *voir dire* was inadequate, the Government does not mince words:

> More importantly, defendant's *voir dire* was, as a whole, more than sufficient. It **began with a jointly-submitted, 139-item questionnaire, which the court reduced to 99 items** and sent to 650 prospective jurors. A497-535, 571-601, 963. The survey included numerous questions designed to uncover potential pretrial-publicity bias – including nine media-consumption questions, 12 political involvement questions, and 11 defense-connection questions, including whether "there have been any actions by" defendant that "affected you in a personal way" – and if so, to explain. A 584-92. It also included 14 pretrial-publicity and case-knowledge questions, including whether prospective jurors had heard about the case, how closely they followed it, from what sources, and whether they had "expressed an opinion about" the case or "those involved to anyone" – and if so, to explain. A592-95
>
> After the court and parties reviewed responses and made for-cause strikes, a 142 member venire appeared in court. A1553-65.

(*See* Brief of the United States (Doc. No. 105) at 72) (emphasis added). Nothing in this full-throated defense of the extensive *voir dire* conducted by the district court can be squared with the Government's effort to downplay the questionnaire responses when the issue of transparency is front and center.[2]

---

[2] This passage also contains the revelation that the questionnaire went to 650 people, and that prior to the in-court *voir dire* proceedings on July 28, 2014, the district court engaged in some form of off-the-record review and "for-cause" striking. This process had not been disclosed until the United States filed its opposition brief in this Court on March 26, 2015, six months after the trial ended, and six days after the *Post* filed its petition for writ of mandamus. (*See* Brief of the United States (Doc. No. 105) at 72.)

9

### III. The Government Offers After the Fact Rationalizations for the Outcome Below.

The Government re-characterizes at least three key aspects of the proceedings below. They concern: (1) the use of questionnaires generally; (2) the significance of fair trial rights; and (3) a claimed promise of confidentiality, either express or implied, to prospective jurors that allegedly accompanied the questionnaires.

First, this case poses no "great threat to the use of questionnaires in future cases." (Gov't Resp. at 21.) Not once in this case did the *Post* challenge the use of questionnaires in connection with juror *voir dire*. The use of written questions to streamline juror selection, particularly in complex or high-publicity matters, is a modern fact of life. The point the *Post* has made repeatedly is that a court employing that technique must honor the First Amendment-based presumption of transparency and proceed in a fashion that makes the use of questionnaires the functional equivalent, for access purposes, of in-court questioning. The Government's argument that the *Post*'s plea for transparency of the process is an attack on the process itself is simple misdirection.

Second, the Government endeavors to set up a conflict between the *Post*'s request for open *voir dire* and the defendants' fair trial rights. In essence, it argues: (1) a defendant is entitled to a fair and impartial jury; (2) a defendant cannot get a fair and impartial jury if it is unable to obtain detailed information

10

from prospective jurors; (3) jurors will not provide the detailed information unless it is kept under seal; and (4) consequently, sealing of juror answers is required to ensure a fair trial. (*See* Gov't Resp. at 2-3, 15-16.)

This neat syllogism hinges on the *ipse dixit* that jurors in all cases will refuse to provide information unless they can provide it in secret. If that is true, it necessarily implies a rule of law based on a presumption of secret *voir dire* in order to ensure fairness to the defendant. That is demonstrably not the law, and the selection of jurors to hear evidence at trial within a presumptively open system has proven time and again that jurors will give candid responses during an open selection process.

Open juror selection works because the trial courts (applying *Press Enterprise I* since 1984) ensure that citizens performing their civic duty understand they are participating in a transparent process, in which their individual, deeply personal information can be timely identified and protected from disclosure. That is accomplished through procedures that involve notice, hearing and specific findings under a rigorous standard. In this case, the candor of individual jurors answering the questionnaire could not have been a factor in the district court's decision to seal the record. The answers were in hand before the district court sealed them. The record was sealed only after juror *voir dire*, both written and in-court, had been completed.

11

This pointedly distinguishes the instant case from *South Carolina Press Ass'n*, cited repeatedly by the Government in support of its arguments. (*See* Gov't Resp. at 2, 17 and 19.) Unlike the district court in this case, the district court in *South Carolina Press Ass'n* made detailed findings supporting its conclusion that secrecy was necessary in order to obtain full and truthful answers. This Court placed emphasis on those specific findings – they are quoted at length and comprise a significant portion of the opinion. *See South Carolina Press Ass'n*, 946 F.2d at 1041-43. There are no findings concerning juror candor in the record in this case.[3]

Third, the Government suggests that the district court made a promise of confidentiality to jurors. The Government references the cover letter that accompanied the juror questionnaire. In that cover letter, the prospective jurors were told that the questionnaire responses would be used solely for the purpose of jury selection. That statement was true. There is no way to extract from the letter, however, a promise to jurors that their answers would be sealed. To reach that conclusion, the Government next refers to the district court's First Sealing Order, which made reference to "private, personal and confidential information regarding

---

[3] The fact that neither defendant, since trial concluded, has opposed the *Post*'s efforts to obtain the questionnaire responses, with answers linked to the persons who gave them, speaks for itself. It is a clear indication that fair trial considerations are *de minimis* in the aftermath of the trial itself.

each potential juror." (*See* Pet., Ex. 6.) That phrase, included in an order issued without notice or hearing, is interpreted by the Government as "'a district court's interpretation of its own' rulings." (*See* Gov't Resp. at 13.) There is no basis for the Government to characterize a cover letter as a prior "ruling." Moreover, the interpretive order does not mention the cover letter.

The Government comes dangerously close to suggesting that the district court, perhaps with the complicity of the parties, intended to keep the questionnaire responses secret from the outset, and knowingly rejected the well-established notice and hearing procedures for sealing a court proceeding or a court record. In stating that "jurors should not be misled about confidentiality" (Gov't Resp. at 16), the Government is warning this Court that it will now be complicit in misleading jurors if it grants the petition. On this record, it necessarily means that the McDonnell jurors received, understood and relied on a promise of confidentiality that was delivered with a wink and a nod rather than in explicit terms. That scenario seems extraordinarily unlikely. In any event, such promises of confidentiality "are not merely inappropriate; they are constitutionally unsound." *In re Access to Jury Questionnaires*, 37 A.3d at 889; *see also In re South Carolina Press Ass'n, supra*, 946 F.2d at n.3 ("[W]hen the court and the attorneys prepare such a questionnaire and promise confidentiality of responses thereto, they must consider the notice requirements of *In Re Knight*."); *Bellas v.*

13

*Superior Court*, 85 Cal. App. 4th 636, 652 (Cal. App. 1st Dist. 2000) (rejecting confidentiality promise as a basis for withholding responses to the *voir dire* questionnaire) ("No comprehensive offer of protection from public disclosure of information communicated on juror questionnaires is legally effectual where public access is mandated by the First Amendment."); *State ex rel. Beacon Journal Publ'g Co. v. Bond*, 781 N.E.2d 180, 190 (Ohio 2002) (same) ("Constitutional rights are not superseded by the mere promise of a trial judge to act contrary to those rights … [T]rial courts should make no such promise of confidentiality, but instead conspicuously advise prospective jurors in writing that, notwithstanding the per se exceptions listed herein, their responses may be subject to public disclosure."); *Forum Communs. Co. v. Paulson*, 752 N.W.2d 177, 186 (N.D. 2008) (same) ("The trial court must not offer a guarantee of protection from public disclosure of information contained in juror questionnaires.").

### IV.   The Government Now Generates Vague and Overstated Harms.

The Government's brief introduces two categories of harm that were not articulated in any findings generated by the district court.

First are the bogeymen lurking throughout the brief. They are "people with less altruistic motives than the press." (Gov't Resp. at 6.) They are "fraudsters." (*Id*. at 7.) They are "people with bad motives." (*Id*. at 16.) The apparent concern is that these people will engage in identity theft. It is left to the imagination how

14

this will be done, as the usual means of accomplishing that end, such as access to bank account or social security numbers, is not implicated here.[4] The mere posting of information on the Internet (*see id.* at 7) is not inherently harmful, and no finding in the record suggests that this alleged harm was considered, much less found to be compelling, by the district court.

Second are the inchoate privacy harms that the Government asserts without reference to the standard of *Press-Enterprise I*. Only once does the Government cite the correct test: that a juror has a compelling interest in the protection of "deeply personal matters." (*See* Gov't Resp. at 20) (quoting *Press-Enterprise I*.) It prefers the term "sensitive," borrowing language from *Presley v. Georgia*, 558 U.S. 209, 215 (2010). (*See* Gov't Resp. at 17; *see also id.* at 22). It is apparent, however, that the Supreme Court in *Presley* was referring not to juror privacy, but to information that the Government might find sensitive, such as ongoing investigations or matters of national security.

The Government does not measure its parade of "sensitive" matters disclosed by prospective jurors against the benchmark of "deeply personal" matters. Names, addresses, occupations, terminations from employment, media consumption habits, or political predispositions of jurors and their spouses are

---

[4] The *Post*'s initial motion to unseal stated that it was not asking the district court to release any information that might facilitate identity theft or disclose private medical information.

15

available by numerous means, and are not held in deep confidence by most people. The fact that a prospective juror or a family member may have been charged with a crime, or convicted, is a matter of public record. Such matters are momentarily embarrassing to disclose, perhaps, but not deeply personal. The decided cases set a very high standard for a compelling interest to be found. There was no systematic inquiry by the district court that unearthed questions or answers in this case that had the toxicity of the race issue in the *South Carolina Press Ass'n* case. There is nothing to suggest every juror, in answering questions about prior victimization, disclosed the equivalent of the sexual assault scenario discussed in *Press-Enterprise I*.

The Government tries without subtlety to limit this Court's options by suggesting that disclosure of names at this late date is too damaging, because sensitive information has already been released without any personal identifiers. (Gov't Resp. at 3.) To now connect those identifiers to the information is not only to break an implied promise, argues the Government, but to allow a damaging connection between confidential information and the person who gave it. This presupposes that any of the "sensitive" information cited by the Government, in fact, meets the *Press-Enterprise I* test. It also makes no effort to consider a less restrictive alternative than shrouding the names of all participants in secrecy.

If it is true, as the Government suggests at page 12 of its brief, that one of the prospective jurors was a rape victim, the reference to that crime is not apparent from any questionnaire response. One juror was excused after submission of a letter, the contents of which were not disclosed. (*See* Pet., Ex. 4 at 100:14-101:4.) The name of that juror is not in the public transcript. If in fact that person disclosed such a deeply personal matter, his or her name can simply be withheld. That is not an argument, however, for wholesale anonymity of all participants in the process.

The Government's approach suggests a basic misunderstanding of the Supreme Court's teaching in *Press-Enterprise I*. The focus of the inquiry is on the disclosure of deeply personal information by an individual juror. The same question can elicit very different answers from different people. Asking "have you ever been the victim or a crime?" could lead to the disclosure of a sexual assault at the trial of an alleged car thief, an alleged rapist, or a former governor accused of federal crimes. The effort to distinguish this case from *Press-Enterprise I* because it is "a high-profile public corruption case" misses the point. (Gov't Resp. at 20.) There is no rule of heightened *voir dire* secrecy for VIP trials; the public's right of access is at its strongest in a case of this nature, where the Government is alleging corruption by a governor while in office. By the same token, when a compelling

17

interest to protect a juror is present, that interest is not diminished by either the nature of the underlying charge or the celebrity of the defendant.

## CONCLUSION

The Government's contention that the district court's refusal to disclose the identity of any prospective juror, whether selected or not, is a "limited" or "effectively minimal" outcome cannot be squared with controlling First Amendment law. The rule of *Press-Enterprise I* is not diminished because a district court makes a case-management decision to employ a written questionnaire for *voir dire*. A writ of mandamus should issue to compel the release of questionnaire responses with the names of all persons who completed them disclosed. If there is a compelling interest present to protect an individual, the district court should enter an order, based on findings, that the name of that person should remain sealed.

Date:  April 20, 2015.

Respectfully submitted,

WP COMPANY LLC

By Counsel

/s/ Craig T. Merritt
Craig T. Merritt (VSB No. 20281)
David B. Lacy (VSB No. 71177)
CHRISTIAN & BARTON, L.L.P.
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
Tel.:   (804) 697-4100
Fax:   (804) 697-4112
cmerritt@cblaw.com
dlacy@cblaw.com

*Counsel for The Washington Post*

# **CERTIFICATE OF SERVICE**

I certify that on April 20, 2015, I filed electronically the foregoing response with the Clerk of the Court using the CM/ECF system, which will send notice of the filing to all attorneys of record in this case.


/s/ Craig T. Merritt
Craig T. Merritt (VSB No. 20281)
cmerritt@cblaw.com
CHRISTIAN & BARTON, L.L.P.
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095

#1741807